AOC - 275.1    Doc. Code: COM
Rev. 5-02
Page 1 of 3
Commonwealth of Kentucky
Court of Justice
KRS Chapter 403

**DOMESTIC VIOLENCE
PETITION / MOTION**

Case No. 02-D-00201-00
Court _family_
County _Pike_

| JONAH | L | STEVENS | PETITIONER |
|---|---|---|---|
| First | Middle | Last | VS. |

| Ken (Amy) | L. | ~~McNew~~ McNew. | RESPONDENT |
|---|---|---|---|
| First | Middle | Last | |

*This time it's Jonah L. Stevens for Jonah Lee Stevens.*

**Information about Respondent:**

Current Residence: 43 Joe Napern (?) Ave Pikeville Ky (110?)

Usual Residence: _Same_

Occupation:

Employer Name: _Fannel Pike Co_

Employer Address:

*This attorney is claiming that domestic violence took place on August 5, 2002.*

| Sex | Race | Birthdate | Height | Weight | SSN | Operator License # | State |
|---|---|---|---|---|---|---|---|
| F | W | ~~■■~~ 8 | 5'5" | 200 | LNK | UNK | Ky |

**CAUTION:** [ ] Weapon involved [ ] Believed to be armed and dangerous

The Parties have a [ ] custody [ ] dissolution action pending in _____ Circuit Court.

[ ] Petitioner, [X] Petitioner, on behalf of minor child(ren) says that on _____, 2____, in _____ County, Kentucky, the above-named Respondent engaged in act(s) of domestic violence and abuse, in that":

ON 8-5-2002 RESPONDENT BEGAN ARGUING IN ANGER UNDER A FALSE ACCUSATION THAT PETITIONER HAD GONE BROKE. FEMALE 5'7" 200 RESPONDENT BEGAN TO YELL AND MORE, CAUSING PETITIONER, CANNOT COMPLETE... WHILE PETITIONER HELD MINOR CHILD. PETITIONER HAD TO GATHER... MINOR CHILD WHILE PETITIONER BORE THE IMPACT OF THE FALL. RESPONDENT THREATENED THAT HER ACTIONS WERE NOT OVER, AND WAS IN THE PAST THREW METAL OBJECTS AT PETITIONER, RESPONDENT WRECKED AND DESTROYED ALL ELECTRONIC EQUIPMENT IN HOME, AND IF THREW... CARE... REFUSED THAT SHE... CONTROL OF FURTHER... RESPONDENT REFUSED TO LEAVE... WAS PHYSICAL/MENTAL FOR PETITIONER... SEEN... TO... OR R... ...CIVIL CUSTODY...

Copies to:
Court File
Petitioner
Respondent (copy with blacked-out portion served with summons)
Local Department for Community Based Services CFC
Court Clerk in County of Petitioner's usual residence, if different
Law enforcement agency(ies) designated for service
Law enforcement agency/dispatch center responsible for LINK entry

*If additional space is needed for the factual statement, type on a separate sheet of paper and attach to the Petition/Motion.

...SURE ENTRIES IN BOXES ARE COMPLETE, ACCURATE AND LEGIBLE TO ALLOW PROMPT ENTRY INTO LINK IF ORDER OR ...IONS ISSUES

Page _____ of _____

PLAINTIFF'S

Exhibit 3

Exhibit 10

5.1
-02
3 of 3

Case No. 02-D-U0202-02

## MOTION FOR RELIEF

[ ] Petitioner OR [X] Petitioner, on behalf of minor child(ren), requests that the Court:

(1) Issue an emergency protective order based on the presence of an immediate and present danger of domestic violence and abuse to:

[ ] restrain Respondent from committing any further acts of domestic violence and abuse; and/or

[ ] restrain Respondent from any contact or communication with Petitioner except as directed by the Court; and/or

[ ] restrain Respondent from disposing of, or damaging, any property of the parties; and/or

[ ] direct Respondent to vacate residence shared by the parties located at (specify address):

_Notice that the "must be signed" box is blank and the date is July 22, 2002_

[X] grant temporary custody of minor child(ren);

[ ] award temporary child support in accordance with Ky Child Support Guidelines. I will, if possible, document income of both parents at the hearing by producing income tax returns, paystubs or employer statements. If either parent is self-employed I will, if possible, produce receipts and expense statements. I understand Respondent will also be notified by summons to produce these documents.

[ ] grant other relief which would assist in stopping further domestic violence (describe) _Ore reservation of extreme risk at hearing in the past, request that court order a psychological assessment if required_ and,

(2) Cause a summons to be issued for Respondent, setting a date, time and place for a hearing to consider all relief to which Petitioner may be entitled, including those matters contained in paragraph (1) on this page of this motion, and as appropriate, mandatory counseling for Respondent and other relief as may be authorized by statute.

Petitioner states the allegations contained herein are true on information and belief.

_____
Petitioner's / Movant's Signature

Subscribed and sworn to before me on _____, 2____

Date: _____, 2____

            *Name

            Title

*Must be signed by circuit clerk or other individual authorized by Court to provide and verify emergency petitions.

**COURT ACTION:**

EPO/Summons: [ ] Issued [ ] Denied because: _____

Summons: [X] Issued [ ] Denied because: _____

Date: July 22, 2002          _____ Judge

# ORDER OF PROTECTION

AOC-275.3
Rev. 10-01
Doc. Code: ODV
Page 1 of 3

☒ DOMESTIC VIOLENCE ORDER
☐ AMENDED DOMESTIC VIOLENCE ORDER

Case No. 02-D-00202-001

Court _____ Family

County _____ Pike _____ State KY

## PETITIONER/PLAINTIFF

| Jonah | L. | Stevens |
|---|---|---|
| First | Middle | Last |

And/or on behalf of minor family members(s):(list name and DOB) _____

## PETITIONER/PLAINTIFF IDENTIFIERS

_____ -02

Date of Birth of Petitioner

Other Protected Persons/DOB:

## V.

## RESPONDENT/DEFENDANT

| Amy | L. | Mischler |
|---|---|---|
| First | Middle | Last |

Relationship to Petitioner: ☐ spouse ☒ former spouse
☐ unmarried, child in common ☐ unmarried, currently or formerly living together ☐ child ☐ stepchild
☐ parent ☐ grandparent ☐ other relative (specify)

_____

Respondent Address: 49 Joe Hampton Road
Pikeville, KY 41501

## RESPONDENT/DEFENDANT IDENTIFIERS

| SEX | RACE | DOB | HT | WT |
|---|---|---|---|---|
| F | W | _-_-65 | 5' 5" | 200 |
| EYES | HAIR | Social Security # | | |
| | | | | |
| DRIVERS LICENSE # | | STATE | EXP. DATE | |
| | | | | |

Distinguishing Features _____

CAUTION:

☐ Weapon involved ☐ Armed and Dangerous ☐ Divorce/Custody/Visitation case pending

## THE COURT HEREBY FINDS:

That it has jurisdiction over the parties and subject matter, and the Respondent has been provided with reasonable notice and opportunity to be heard.

☐ Additional findings of this order are as set forth below.

## THE COURT HEREBY ORDERS:

☐ That the above-named Respondent be restrained from committing further acts of abuse or threats of abuse.
☐ That the above-named Respondent be restrained from any contact with the Petitioner/Plaintiff.
☐ Additional terms of this order are as set forth below.

The terms of this order shall be effective until [_____] , [_____] .

## WARNING TO RESPONDENT:

This order shall be enforced, even without registration, by the courts of any state, the District of Columbia, any U.S. Territory, and may be enforced by Tribal Lands (18 U.S.C. Section 2265). Crossing state, territorial, or tribal boundaries to violate this order may result in federal imprisonment (18 U.S.C. Section 2262).

Federal law provides penalties for possessing, transporting, shipping, or receiving any firearm or ammunition (18 U.S.C. Section 922(g)(8)).

Only the Court can change this order.

Exhibit 11

## ADDITIONAL FINDINGS:

❑ For the Petitioner against the above-named Respondent in that it was established, by a preponderance of the evidence, that an act(s) of domestic violence or abuse has occurred and may again occur; or

☒ For the Respondent in that it was not established, by a preponderance of the evidence, that an act(s) of domestic violence or abuse has occurred and may again occur; or

❑ The ❑ Petitioner ❑ Respondent has filed a motion to amend the Domestic Violence Order dated

_____

## ADDITIONAL TERMS OF ORDER:

**That the above-named Respondent surrender to the Court, or to the officer serving the order, Respondent's Kentucky license to carry concealed firearms or other deadly weapons pursuant to KRS 237.110(11).**

❑ Kentucky license to carry surrendered to Court.

☒ That the Petition/Motion to Amend be ☒ Dismissed ❑ Denied.

❑ That the motion to amend is sustained. ❑ That the prior order is amended pursuant to a show cause hearing. The prior order is amended as follows, and all prior inconsistent provisions of such prior order are superseded

as follows: _____

_____

❑ That the above-named Respondent is restrained from any contact or communication with the above-named Petitioner;

❑ That Respondent shall remain at all times and places at least _____ feet away from Petitioner and members of Petitioner's family or household;

❑ except as follows: _____

_____

❑ That the above-named Respondent be restrained from disposing of, or damaging, any property of the parties;

❑ That the above-named Respondent vacate the residence shared by the parties located at

_____

(specific address)

❑ In accordance with the criteria of KRS 403.270, 403.320, and 403.420, the Uniform Child Custody Jurisdiction Act and 28 U.S.C.A. Section 1738A temporary custody of:

_____

_____

_____

(List names, ages and sex of each child)

be awarded to _____

❏ That the above-named Respondent, is ordered to pay temporary support in the amount of

$ _____ as set forth in form AOC 152 Kentucky Uniform Child Support Order. **(AOC 152 shall also be used if child support is ordered.)**

❏ That the above-named Respondent participate in available counseling services, described as

_____

❏ In order to assist in eliminating future acts of domestic violence and abuse, _____

_____

_____

_____

❏ (To be used only in dissolution or custody action)
That the court finds that the victim has requested mediation and the victim's request is voluntary and not the result of coercion and that mediation is a realistic and viable alternative to or adjunct to the issuance of this

order, therefore that available mediation services be ordered as follows: _____

_____

The terms of this order shall not exceed three years from date of issue pursuant to KRS 403.750(2). The Petitioner may return to the court which issued this order before expiration of this order to request that it be reissued for an additional period not to exceed three years. **The number of times this Order may be reissued shall not be limited. KRS 403.750(3).**

**Violation of this order shall constitute contempt of this Court and may result in criminal charges. Any peace officer shall arrest the Respondent without a warrant upon probable cause that a violation of this order has occurred.** Pursuant to 18 U.S.C. Section 922(g)(8), it may be a federal violation to purchase, receive or possess a firearm or ammunition while subject to this order.

| | |
|---|---|
| Date | Judge |

Copies to:
- Court file
- Petitioner
- Respondent
- Court clerk in county of Petitioner's usual residence, if different.
- Law enforcement agency/dispatch center responsible for LINK entry.
- Law enforcement agency(ies) designated for service.
- Local Department for Social Services, Cabinet for Families & Children.

**Ensure entries in boxes are complete and legible. Without the correct information in each box the order WILL NOT be entered into the LINK system.**

BEFORE: HON. JULIE PAXTON, SPECIAL JUDGE

ACTION NO.    02-D-00202-001
              02-D-00202-002

AMY MISCHLER                                    PETITIONER

vs.                      ORDER

JONAH STEVENS                                   RESPONDENT

** ** ** ** ** ** ** ** **

This cause having come before the Court on cross-petitions for the issuance of a Domestic Violence Order and the Petitioner , Amy Mischler, having been present and unrepresented by counsel, and the Respondent, Jonah Stevens, having been present and represented by Agnes Sipple Trujillo, Esq. and the Court having heard the testimony of the parties and being otherwise sufficiently advised, IT IS HEREBY ORDERED AS FOLLOWS:

1. Both petitions be and the same are hereby DISMISSED;

2. The Court notes that certain motions regarding custody and visitation have been filed in the parties' divorce case, but that the following custody and visitation arrangement is acceptable pending a hearing on said motions. Pending such a hearing, the parties' minor children shall remain at the at the Respondent's mother's home.

3. The Respondent shall have access to his minor children up through 6:30 p.m. each evening, Monday through Friday, with the right to make arrangements for the parties' oldest child to be

Exhibit 12


EXHIBIT
B

taken and picked up from school.

4. The Petitioner shall have access to the parties' minor children from Friday at 6:00 p.m. until Sunday at 6:00 p.m. The parties' minor children shall be picked up and returned to the Respondent's mother's home outside of the presence of the other party. The parties' children shall remain in Pike County during the pendency of this action.

IT IS SO ORDERED this the 18 day of September, 2002.

_____
Julie Paxton, Special Judge

CERTIFICATE OF SERVICE:

I certify that a true copy of the foregoing Order has been mailed to all attorneys and/or parties of record on this the 23 day of September, 2002.

DAVID DESKINS, CLERK
PIKE CIRCUIT COURT

By: _____ D.C.

**21.580  Senior Status Program for Special Judges.** (Effective until July 1, 2007. See 5/23/2007 LRC note).

(1)  As a pilot project to determine the effectiveness of using senior retired judges to combat backlog and delay in Kentucky courts, there is hereby created a "Senior Status Program for Special Judges." The program shall be implemented as follows:

(a)  KRS 21.400(1) and any other provision in KRS Chapter 21 to the contrary notwithstanding, a member who retires at a time when combining his total years of judicial service credit and his age equals or exceeds the number seventy-five (75), may elect, within ninety (90) days following retirement, to participate in the "Senior Status Program for Special Judges," if he complies with the provisions of this subsection. In that event, the member shall be entitled to a service retirement allowance, commencing at the member's normal retirement age, payable monthly during his lifetime in an amount equal to five percent (5%) of his final compensation multiplied by the number of years of his judicial service, not to exceed twenty (20) years of judicial service at the five percent (5%) factor, not to exceed one hundred percent (100%) of final compensation. "Final compensation", notwithstanding any provision to the contrary, for all members retiring under any provision of KRS 21.345 to 21.570 or this section, or similar statutes governing the same positions, as defined in KRS 21.400 shall be based on a period of thirty-six (36) months. Any nonjudicial time shall be counted as is otherwise provided in KRS Chapter 21, but in no event shall service retirement allowance exceed one hundred percent (100%) of final compensation.

1.  In the event the retiring judge elects to retire as a "Senior Status Special Judge" under this subsection, he shall commit to serve, upon appointment by the Chief Justice of the Commonwealth, as special judge for one hundred twenty (120) work days per year for a term of five (5) years without compensation other than the retirement benefits under this subsection. The Senior Status Special Judge may agree to work more than one hundred twenty (120) days in any year within the five (5) years of service; however, the Senior Status Special Judge shall be compensated as otherwise provided by law, in addition to his retirement benefits, for any days served in excess of one hundred twenty (120) in that year. If the Senior Status Special Judge has not served a total of six hundred (600) days within the five (5) year period outlined in this subsection, the Chief Justice shall require the Senior Status Special Judge to serve at no additional compensation to the Senior Status Special Judge, until the six hundred (600) day period is served by the Senior Status Special Judge. The Senior Status Special Judge and the Chief Justice may agree in writing to serve less than the one hundred twenty (120) days in any one (1) or more of the five (5) years; however, any of the days not served in a given year shall be served at the end of the five (5) year period set forth in this subsection.

2.  Should any member electing to retire under the Senior Status Program

*Exhibit 13*

for Special Judges fail, when ordered by the Chief Justice to serve the requisite number of days not to exceed one hundred twenty (120) days a year for the five (5) year period outlined in this subsection, unless otherwise agreed in writing, he shall no longer be eligible for benefits computed under this subsection and shall return to the benefits otherwise provided under this chapter.

3. Subject to Section 110(5)(b) of the Kentucky Constitution, the Chief Justice shall give due regard, when practical, to the desirability of appointing Senior Status Special Judges to serve within their judicial region as defined by the regional administration charter.

(b) The inviolable contract provisions of Kentucky law, KRS 21.480, shall apply during the period of time that KRS 21.580 is effective; however, no other provisions of 2000 Ky. Acts ch. 305 shall be considered subject to an inviolable contract of the Commonwealth.

(c) Nothing contained in this section shall be construed to invalidate provisions in the current law which require a penalty for retiring before the normal retirement age.

(2) The Senior Status Program for Special Judges created by this section shall be open to any member who is a judge in office on June 24, 2003, and who subsequently retires as a Senior Status Special Judge on or before January 31, 2009.

Effective: June 24, 2003

History: Amended 2003 Ky. Acts ch. 128, sec. 6, effective June 24, 2003. -- Amended 2002 Ky. Acts ch. 258, sec. 1, effective July 15, 2002. -- Repealed 2000 Ky. Acts ch. 305, sec. 4, effective July 1, 2007 -- Created 2000 Ky. Acts ch. 305, sec. 1, effective July 14, 2000.

Legislative Research Commission Note (5/23/2007). On May 23, 2007, the Franklin Circuit Court held that the enrollment and expiration dates for the Senior Status Program for Special Judges established by this statute were extended to January 31, 2009. George v. Board of Trustees of Judicial Form Retirement System, 07-CI-00587.

Legislative Research Commission Note (6/24/2003). 2000 Ky. Acts ch. 305, sec. 1, created KRS 21.580, which established the Senior Status Program for Special Judges. Section 4 of the same Act repealed KRS 21.580 effective July 1, 2007. Thereafter, 2002 Ky. Acts ch. 258, sec. 1, amended KRS 21.580 to change the retirement date from June 30, 2007, to January 31, 2009, and 2003 Ky. Acts ch. 128, sec. 6, amended KRS 21.580 to extend eligibility for the program to judges in office on June 24, 2003. Neither of these Acts specifically addresses the repeal set out in the 2000 Act.

to inform the Chief Justice, or his designee, of any formal complaint, investigation, charge or proceeding filed and/or pursued by the JCC, or any discipline imposed upon the retiring Justice or Judge without the filing of a formal charge or proceeding.

Upon verification that the retiring Justice or Judge qualifies to participate in the program, the member shall complete a **Letter of Election** which will be forwarded to the member by the JRP. In accord with the provisions of KRS 21.580, the **Letter of Election** shall be returned to the JRP within 90 days of retirement.

## IV.  Requirements

A.)  A member who elects to retire as a Senior Judge shall commit to serve, upon assignment by the Chief Justice, one hundred twenty (120) work days per year for a term of five (5) years without compensation other than the enhanced retirement benefits specified in I. (C).

B.)  If the Senior Judge has not served a total of six hundred (600) work days within the five (5) year period, the Chief Justice shall require the Senior Judge to serve at no additional compensation until the six hundred (600) work day period is satisfied, except in the event of death or permanent disability of the Senior Judge.

C.)  The Chief Justice and the Senior Judge may agree in writing that the Senior Judge may serve less than the one hundred twenty (120) work days in any one or more of the five (5) years; however, any of the work days not served in a given year shall be served at the end of the five (5) year period. The six hundred (600) work days must be completed within ten (10) years of the Senior Judge's retirement date.

D.)  Should a Senior Judge fail, when ordered by the Chief Justice, to serve the requisite number of days not to exceed one hundred twenty (120) work days a year for the five (5) year period, unless otherwise agreed in writing, the Senior Judge shall no longer be eligible for enhanced retirement benefits and shall return to the benefits otherwise provided under KRS Chapter 21.

E.)  Credit toward the one hundred twenty (120) work day requirement shall be earned in daily Monday through Friday increments. Service performed on Saturday, Sunday or state holidays shall not be prohibited, but must be pre-approved by the SJP Administrator. In response to an assignment by the Chief Justice, research, preparation of orders and findings of fact and opinions, training, travel, and other matters normally associated with the performance of judicial services shall be credited toward the one hundred


Exhibit 14

# INVESTIGATIVE REPORT

## Cabinet for Health and Family Services

## OFFICE OF
## INSPECTOR GENERAL

**ROBERT J. BENVENUTI III, Esq., INSPECTOR GENERAL**



**Allegations of misconduct by certain employees of the Department for Community Based Services' Lincoln Trail Region related to the removal of children and/or the termination of parental rights based on alleged abuse, neglect, or dependency.**

### Report Date: January 10, 2007

Exhibit 15

completed, although visits and conversations with the biological father were documented in the file, as well.

2. Both current and former workers report documentation was omitted or added to case files to intentionally mislead the court. In some cases, this was to assure children were returned to their biological parents and, in other cases, it was reportedly to assure the Judge would rule for termination of the parents' rights. One worker conveyed that a frontline supervisor, at the direction of a regional supervisor, instructed her to enter information/contacts into a file for incidents that occurred prior to the worker being assigned the case. The former caseworker had already resigned from DCBS, so that worker was unable to verify if the information she was being asked to enter into the file was accurate.

3. There have been instances of dishonesty by DCBS employees, in documentation, in court, and in interactions with clients. OIG investigators have determined home visits and attempted home visits were documented in case files and the TWIST computer system that did not in fact occur. One caseworker advised a biological mother that her child had been to see a doctor, since the mother's last visit, without knowing if the child had seen a doctor or not. A caseworker advised she was unaware of any information regarding a child's parents or grandparents when there was a large volume of information on the relatives in the case file and the TWIST computer system. A veteran caseworker used the term "sexual predator" to describe a parent in the TWIST computer system and the case file. She stated the use of this was appropriate because a professional assessor had used this term and she was merely repeating his term. The caseworker used the term in a July 2005 court report and the assessment report she claimed to have obtained the term from was not completed until almost seven months later. Additionally, a review of the assessment report determined the term "sexual predator" was not used in the assessment report, so it would have been impossible for the term to have been derived from this report.

4. DCBS staff has routinely signed official documents as other staff members, usually supervisors. These documents included timesheets, travel vouchers for reimbursement of travel expenses, reports to the courts, purchase requests, and computer access approval forms.

5. During the 2001 Council on Accreditation (COA) review, Lincoln Trail regional supervisors manipulated caseload assignments and reported them to COA as lower than they actually were. Reportedly, this was intended to assure compliance with COA standards. Workers reported their cases were reassigned to them when COA left. Regional supervisors reported this act was not repeated during the 2006 COA review because they decided to let COA see the situation as it really was and, therefore, the caseloads were out of compliance.

6. In 2000, an SRA falsely advised the Cabinet that an employee's workstation was an office location closer to the employee's residence than her actual workstation. The primary benefit would be that the employee would be permitted to claim travel reimbursement for driving to work, daily. Descending SRAs permitted the situation to continue. Although other employees requested the same benefit, their requests were denied and they were advised this was a decision made by a previous supervisor and a previous administration, and it could not be changed.

"Fast Tracking" Adoptions:

7. The Adoptions and Safe Families Act, Public Law 105-89 (ASFA) was signed into law in 1997. It was intended to prevent children from languishing in foster care until they were no longer likely to be adopted. This law mandated permanency hearings to be held no later than 12 months after a child enters out-of-home care (OOHC). It also required state child welfare agencies to monitor the time children remain in care, and required the initiation of TPR proceedings for children who have been in state custody for 15 of the most recent 22 months. Only three circumstances are to be considered as reason

| Case Number | Allegation | Type of Issues | Findings | Actions |
|---|---|---|---|---|
| 2006-120-047 | Falsification of Records, Unprofessional Conduct, and Retaliation Against Employees | Yelled at subordinates, instructed subordinate to delete a contact in TWIST, solicited complaints on a subordinate, from other employees, she had previously blamed for initiating the OIG investigation. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-147-047 | Falsification of Records | Falsely documented information in case files and reports. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-148-047 | Falsification of Records | Falsely signed other employees' names to official documents. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-149-047 | Falsification of Records | Instructed a subordinate to include false documentation in case files. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-150-047 | Falsification of Records | Falsely signed a supervisor's name to an official document. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |

| Case Number | Allegation | Type of Issues | Findings | Actions |
|---|---|---|---|---|
| 2006-027-047 | Falsification of Records and Dishonesty | Falsely accused client of threatening her, entered false documentation into a client's file, falsified testimony in court. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-028-047 | Falsification of Records and Unprofessional Conduct | Did not report all facts to the court, cursed and struck client, rude to clients, threatened clients, falsely reported information to the court, falsely signed a document as another employee. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-029-047 | Falsification of Records | Falsely reported home visits and contacts with clients. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-041-047 | Breach of Confidentiality | Divulged information to a person not permitted access to information. | Unsubstantiated | No action required |
| 2006-118-047 | Falsification of Records | Completed official reports with false documentation. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |
| 2006-119-047 | Falsification of Records, Divulged Computer Password, and Retaliation Against Employees | Authorized administrative staff to sign as a supervisor, provided computer password to subordinates, instructed subordinates to remove documentation from the case file, aware of intentional lack of documentation in file and did not instruct subordinate to complete documentation, recommended disciplinary action against a subordinate she had previously blamed for initiating the OIG investigation. | Substantiated | Referral to the Hardin County Commonwealth's Attorney and the CHFS Office of Human Resource Management |

Further, it will eliminate the perception, whether accurate or not, that children removed in such cases are being removed by social service workers for the purpose of punishing the parent for originally denying access.

5. DCBS record management processes and systems are inadequate and must be improved to ensure the integrity of the case reports and the recommendations and actions that flow from the same. Again, we recommend that Cabinet officials look to the Kentucky State Police for model processes while developing and implementing a records management system.

6. DCBS Permanency and Protection staff should receive consistent and repetitive training with regard to the elements required to substantiate abuse, neglect, or dependency. These elements should be standardized across the state and easily identifiable. For example, DCBS policy should mirror KRS (i.e. must have "physical injury" or "serious physical injury" to substantiate physical abuse) and define what elements are necessary to substantiate the abuse. Workers appear confused about what actually exemplifies abuse. For example, some social service workers have told parents it is "illegal" to spank their children.

7. The CHFS Office of the Ombudsman is a greatly underutilized resource in ensuring the integrity of the DCBS actions. Unfortunately, the Office of the Ombudsman has historically and is currently viewed by some individuals as an unnecessary intermeddler. DCBS and the Office of the Ombudsman should work together to develop and implement any and all necessary policy and procedures to better ensure that the two departments work cooperatively to ensure better oversight of the process and that quality control measures are in place to detect process failures and/or weaknesses. At a minimum, any complaint justified by the Office of the Ombudsman should result in a written action plan for the resolution of the issue, through the chain of command, from the SRA to the DCBS Commissioner's Office.

8. Under the current process, the vast majority of TPR cases proceed to court based solely on a review conducted by DCBS regional staff and a Cabinet regional attorney. Based on the gravity of the action, we believe all TPR cases should be reviewed and approved by DCBS Central Office officials prior to petitioning the court for termination. This review should include not only the information contained in the TWIST computer system and the hard case file, but should include interviews with the biological parents and relatives attempting to obtain custody of the child, if any, as well as the social service worker(s) involved to assure the required services have in fact been offered/provided and not just documented as having been offered/provided and that the case is, in fact, appropriate for termination.

9. DCBS management and supervisory staff should follow an established organizational chain of command to ensure that the SRA does not inappropriately defer or abuse his/her management responsibilities within the region and that the SRA's management ability is reviewed by Central Office supervision, to assure accountability and compliance with applicable laws and regulations as well as with agency standard operating procedures. Additional training should be provided to all management and supervisory personnel on methods of supervision and accountability, as well as interacting with clients, community partners, law enforcement and the courts. This training should include the areas of constitutional law, perjury, falsification of records, and the integrity of the court system and penalties associated with non-compliance related to the same.

10. All TWIST records should identify any edits and the date/time of any approvals completed by supervisors. TWIST records should reflect the entry date and time, in addition to the reported date and time of the contact. Such efforts would prevent the occurrence of missing or altered documentation, which several workers claim to have experienced. Additionally, these modifications would provide

11. Client case information is presently contained in two locations, the TWIST computer system and the hard copy case file, requiring duplication of workers' efforts and limited access to all the information available in the case. All documents should be scanned and entered into TWIST, to eliminate the need for a hard copy case file. This would reduce the caseworker's workload, abolish the current need to duplicate records, and provide agency oversight into cases via the ability to access the entire record without traveling to the local office and reviewing a case file. This ability to provide oversight could eliminate the need to contact the case manager to determine what information is available and what documentation has been completed. Additionally, this would permit regional and Central Office supervisors to hold field and regional staff accountable for timely, accurate, and factual documentation.

12. Relatives are often not advised of termination of parental rights proceedings involving family members, since they are not legally an interested party. KRS 625.060 limits the parties to the petitioner, the Cabinet, and the biological parents in an involuntary termination of parental rights hearing. A legislative modification should be considered which would mandate that the Cabinet provide notice to the court of all relatives who have previously requested custody of the children, unless such relatives have been determined to be unsuitable for placement.

13. A reason initially offered for why DCBS would favor adoption over other permanency options was the federal incentive program. This argument does not stand up to scrutiny. Nonetheless, non-adoptive permanency options should be reviewed by Cabinet officials. Kentucky does receive federal funding when children are adopted. However, the amount of adoption subsidies paid to adoptive parents each year far exceeds the adoption incentives received from the federal government. The state may receive from $4,000 to $6,000 per adopted child, depending on the child's needs. Kentucky received just over $1 million in incentives in the 2005 federal fiscal year. During the state fiscal year 2005, the Cabinet paid families more than $37 million in adoption subsidies. These subsidies typically range from $600 to $1,200 per month per child. According to the December 2006 report from the Auditor of Public Accounts, 98% of the 876 children adopted in federal fiscal year 2005 qualified for adoption subsidies. Only 80% of those children were considered a special needs child, and 41% of the total amount was considered special needs due to being a member of a sibling group. The lowest amount paid to Kentucky foster parents is approximately $600 per child per month, but may be as high as $5,671, depending on the child's needs. The Adoption and Safe Families Act of 1997 encourages relative placement. However, it appears relatives are not the preferred placement option when children are removed from their parents' home, as evidenced by the 6.5%, statewide, who are placed with relatives.[17] Since Kinship Care, paid to a relative with temporary or permanent custody of a child in the Cabinet's custody, is typically $300 per month, it would be economically beneficial to the state and, obviously, emotionally beneficial to the child, to encourage relative placements. Accordingly, DCBS should develop and implement a formalized process to ensure relative placement is uniformly identified as the preferred placement, when appropriate.

14. DCBS should study the use of the CATS program to determine if program assessors are always provided accurate and complete information by DCBS staff and whether or not the findings are appropriately applied. The Cabinet should also develop written policy to address the situations for when it is appropriate to obtain additional assessments, outside the CATS program, in order to prevent the procurement of further assessments with the intent of obtaining a specific desired outcome.

---

[17] LRC: Foster Care Report, 2006.

## Individual Summary Face Sheet

| Id: | 656903 | Date Received: | Aug 19 2002 |
|---|---|---|---|

Program/ Subprogram:  Insufficient Information

Completed By:   BRANHAM (BSS-FSOS), DELPHIA

Allegations/Concerns:

Petitioner filed Domestic Violence Petition/Motion.

| Intake Id: | 690095 | Date Received: | Aug 19 2002 |
|---|---|---|---|

Program/ Subprogram:   Insufficient Information

Completed By:   BRANHAM (BSS-FSOS), DELPHIA

Allegations/Concerns:

Has made verbal threats in past.   Spit on me yesterday.  It was the first time it was physical.  Took place yesterday, July 21, 2002 around 12:00 on his grandfather's porch.  I have been frightened of him since his extreme weight loss and personality change.  He is bringing the children with him to court to gain sympathy today.

| Case# | 205338 | Intake Id: | 690097 |
|---|---|---|---|
| Date Received: | May 25 2006 | Date Accepted: | Oct 19 2006 |
| Staff Determination: | Meets Acceptance Criteria | Staff Assigned: | HAMILTON (BS/MSW-SSCI), SHEREENA |
| Outcome: | In home ongoing case | Status: | Complete |

Allegations/Concerns:

Oct 18 2006 11:48AM Shereena Hamilton (BS/MSW-SSCI)
We received a court order to open the case.

| Name | Alleged Perpetrator | Program/Subprogram | Finding | |
|---|---|---|---|---|
| | MISCHLER, AMY | Basic Neglect | Unsubstantiated | |
| | MISCHLER, AMY | Basic Neglect | Unsubstantiated | |

*Exhibit 16*

# Exhibit D

# Individual Summary Face Sheet

| | | | | |
|---|---|---|---|---|
| #: | 205338 | Intake Id: | 690096 | |
| Date Received: | Apr 20 2006 | Date Accepted: | Oct 19 2006 | |
| Staff Determination: | Meets Acceptance Criteria | Staff Assigned: | HAMILTON (BS/MSW-SSCI), SHEREENA | |
| Outcome: | Close Referral | Status: | Complete | |

*No actual Referral* (handwritten)

**Allegations/Concerns:**

Oct 18 2006 11:43AM Shereena Hamilton (BS/MSW-SSCI)
It was reported that Amy took the children in the heat of the day and protested in front of the courthouse stating their father would not provide medical insurance for them. It was reported that one of the children had strep throat and Amy did not get his medication after the father tried to provide her with the money.

| | Alleged Perpetrator | Potential Wrongdoing | Finding | |
|---|---|---|---|---|
| ▓▓▓▓▓▓ | MISCHLER, AMY | Basic Neglect | Unsubstantiated | |
| ▓▓▓▓▓▓ | MISCHLER, AMY | Basic Neglect | Unsubstantiated | |

| | | Date first opened | | | |
|---|---|---|---|---|---|
| 205338 | MISCHLER, AMY | Aug 19 2002 | | WEBB (BSW-FSOS), DEBORAH | Johnson |

**EXHIBIT 4**

Page 11 of 11

(CHFS OLS)

| From: | Womack, Mona S (CHFS OLS) |
|---|---|
| Sent: | Friday, February 12, 2016 12:55 PM |
| To: | Lovely, David T (CHFS OLS) |
| Subject: | FW: |

**From:** Howard Susan (CHFS DCBS EMSR Johnson)
**Sent:** Friday, February 12, 2016 12:49 PM
**To:** Womack, Mona S (CHFS OLS)
**Subject:** RE:

Case Active/Inactive History

Case Active/Inactive History

| Date Event | Event | Case Manager | Supervisor | Merged with Case Number | Merged with Case Name |
|---|---|---|---|---|---|
| 08/17/2007 | Close | PERRY (BSW-FSOS), BOB | MANAGER, EASTERN MOUNTAINS | | |
| 10/18/2006 | Open | TAYLOR (BSW-FSOS), WILMA | MANAGER, EASTERN MOUNTAINS | | |
| 08/27/2002 | Close | BRANHAM (BSS-FSOS), DELPHIA | MANAGER, EASTERN MOUNTAINS | | |
| 08/19/2002 | Open | BRANHAM (BSS-FSOS), DELPHIA | MANAGER, EASTERN MOUNTAINS | | |

If a case has been ongoing at some point, it will usually show as ongoing from then on.

Susan Howard
Service Region Administrator
Eastern Mountain Region
205 Main St.
Paintsville, KY 41240
(606) 788-7106
FAX (606) 788-7117

**Notice of Confidentiality:** This e-mail, including any attachments, is intended for the use of the individual or entity to which it is addressed and may contain confidential information that is legally privileged and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are notified that any review, use, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Womack, Mona S (CHFS OLS)
**Sent:** Friday, February 12, 2016 11:36 AM
**To:** Howard Susan (CHFS DCBS EMSR Johnson)
**Subject:** RE:

Susan,
Can you go in to this doc and clarify that it's been closed?

Exhibit B

Exhibit 17

17/44

DCBS Name: Amy Mischler

# COMMONWEALTH OF KENTUCKY
## CABINET FOR FAMILIES AND CHILDREN
## DEPARTMENT FOR COMMUNITY BASED SERVICES

### FACE SHEET / CASE SUMMARY

Case Manager: Shereena Hamilton (BS-MSW-SSC1)
Supervisor: Wilma Taylor (BSW-FSOS)
County: Pike

| | | | |
|---|---|---|---|
| Date of initial Referral: | Aug 19, 2002 | Date moved to ONG: | Oct 20, 2006 |
| Date of most recent Referral: | Oct 18, 2006 | Date Case Closed: | |
| Number of Referrals: | 3 | | |

Referral Summary

| Referral No. | CPS / APS | Date Received | Date Intake Submitted | Intake Determination | Date Referral Result Submitted | Referral Results |
|---|---|---|---|---|---|---|
| 3 | CPS | Oct 17, 2006 | Oct 18, 2006 | Accept For Investigation | Oct 20, 2006 | Continue Case |
| 2 | CPS | Oct 18, 2006 | Oct 18, 2006 | Accept For Investigation | Oct 20, 2006 | Close Referral |
| 1 | APS | Aug 19, 2002 | Aug 19, 2002 | Information & Referral | | |

Date of Last Contact: Mar 09, 2007
Type of Last Contact: Staffing/Consultation
Date last CQA was approved: Dec 07, 2006
Date last Case Plan was approved: Dec 12, 2006

Exhibit 18

Exhibit C

18/44

Date Received: 10-11-06          Assignment Received From: Commissioner

Specialist Assigned: DDile

Date Administrative Staff Informed of Assignment:


Due Date to Director: 10-20-06   Extension requested on 10-20-06


## Assignment Overview:
Review complaint and prepare an assignment outline
The assignment was a complaint from the NM, Amy Mischler. The complaint was in the form
of an affidavit where the NM listed several situations she thought the courts should consider in
the custody/visitation battle.

## List what was accomplished to complete the assignment (bullet point format):

This reviewer contacted the DCBS worker Kathy Harder. She received a copy of the affidavit
and reviewed the NM's allegations. Her response was that the allegations had been investigated
or did not meet criteria for investigation. The NM included several situations that she was
uncomfortable with, but it did not raise to the level of an investigation.
There are two prior referrals in Twist regarding this family:
1. 04-06 Neglect was investigated and originally unsubstantiated based on information
obtained. However, the NF filed an EPO and the courts overturned custody to the NF. DCBS
was forced to change our finding to match the courts according to SOP. (The NM feels that this
agency is deliberately sabotaging her attempts to fight her ex-husband). This is one example
where this agency attempted to unsubstantiated but had to match the courts findings. The
unsubstantiation appears to be an appropriate finding.
2. 05-06 This referral was added to open the case as court ordered by the Judge. This case is
being directed by the court system and custody of the children is now with the NF with
supervised visits with the NM.



## Recommendations (where appropriate):
None------After review of the investigations the courts have forced this agency to change its
finding as well as open a case.



Date completed and returned to Administrative Staff for Directors review and distribution:
09-03-06  Extension was requested and granted on 10-20-06.


Exhibit G

8

(Attachment D)

**Date Received:** 03-15-2007          **Assignment Received From:** Secretary's office

**Specialist Assigned:** DDile

**Date Administrative Staff Informed of Assignment:**

**Due Date to Director:**          3/23/2007

## Assignment Overview:

- Review complaint

This is the second complaint made by Ms. Mischler. The first complaint is from Oct. 2006 and is attached.

The second complaint is dated 3-15-07 and is addressed to Ms. Shereena Hamilton the SSW in Pike Co. This worker is both the intake worker and then was transferred to on-going where she was the on-going worker. The Intake FSOS is Kathy Larder and the On-going FSOS is Wilma Taylor.

Ms. Mischler states that the purpose of the letter is threefold. "First, it's a demand letter that you observe my due process rights. Second, it is notice of irregularities to Cabinet official who are in charge of supervising you, and third it's an open records request."

The following information was pulled from the letter and will be considered as the complaint:

- She complains that she did not receive a referral for Seven County Services.
- She states that she has never received a finding letter from the Cabinet, however, in her first complaint she was aware that she had a substantiated finding against her for neglect.
- She has not spoken to her worker since December 2006.
- She states that the DVO that caused this agency to change its finding has been vacated.
- She states that this agency was court ordered in May to offer her services and we did not begin this until Dec. 2006
- She states that in November she was told this agency was transferring the case to Jefferson co. and this still has not happened.
- She claims that she has made allegations against her ex-husband and this agency is failing to act because he is an attorney in Pike Co.

## List what was accomplished to complete the assignment (bullet point format):

- Review Twist information # 205338

T/C to Wilma Taylor On-Going FSOS—This reviewer faxed her a copy of the letter to Ms. Hamilton from Ms. Mischler dated 3-5-2007. FSOS states that she has not read this letter but was aware that her worker had received it.

She states that the first investigation came in May 2006 and was substantiated to match the courts findings. She was not aware that the DVO had been vacated and agreed to research this and ask her legal staff to get involved if needed. This is relevant because this agency changed its unsubstantiated finding to substantiated to match the court finding of neglect in regards to this DVO.

Exhibit H          (Attachment D)

difficult. The worker states that she sent a finding letter to the NM but this cannot be verified. A new finding letter was mailed to the NM certified on 3-16-2007.

- A new referral was entered in <u>December of 2006 in</u> order to open the case. It is not known why this happened but, it is probably because the finding on the May referral was entered and closed. Either way it has added a second substantiated finding to the NM's CAN registry and should be corrected. The FSOS is also working on this in order to change the finding. She agreed to call twist if necessary.
- She was not sure that a referral was completed for the NM to attend SCS. She will discuss with the worker.
- She says that a case plan was done with the NM in December. It is unknown if any other contact has occurred with the NM. On the case plan it says that DCBS will make monthly visits to the NM and this has not happened.
- The FSOS states that this is because the case was going to be transferred to Jefferson Co. but they would not accept the case without the hard file. Then Shelbyville was going to take the case and now Johnson Co. is going to take the case. This is to avoid a professional conflict due to the NF is also an attorney in Pike Co. The FSOS says that her FSOS is out this week and she is unsure when this transfer is going to take place.

It appears due to various reasons services have not been offered to this NM. It is difficult to determine as the case is lost and the county is experiencing multiple problems with past dues and staff shortages.

May 2006-Substantiated neglect only because the court changed its finding—This agency was court ordered to offer the NM services. (This reportedly did not occur due to past dues)
December 2006-Case is lost and a third referral is added to open the case (This created an substantiation against the NM that is not accurate).
December 2006-Case plan was complete with the NM, monthly visits have not occurred as we agreed on the case plan and the case has not been transferred as we agreed.
March 2007-A finding letter was mailed to her alerting her to a substation of neglect in May of 2006.

3-23-2007
Conferenced this situation with Mona and Bruce. We spoke with the SRA, Susan Howard and discussed the above concerns. The assignment outline was emailed to her as requested on 3-23-2007.

Response was emailed from FSOS Wilma Taylor:

1. Shereena Hamilton did call Seven Counties to inform intake of Ms Mischler would be calling for an appointment for an intake, she was not informed to complete any type of referral. Shereena assumed Ms Mischler would follow up in making her appointment.

2. I will need Shereena to clarify the order to dismiss, if that will include the finding of neglect.

(Attachment D)



for Johnson County to take case responsibility since court has been transferred from Floyd County to Johnson County Court.

4. Jenny Cook from Floyd County intake team (606-889-1724) is addressing the new allegations regarding Mr. Stevens (father). The supervisor is Angela Baldwin.

5. Ms Wilcox and I will need to work on changing the finding of referral #3 to change the finding, Ms Mischler as far as we know only has the one substantiation and we will make sure the case reflect that.

6. Shereena has not had contact with Ms Mischler since 11/06, the case plan visit, Shereena did make a visit to the father's home. As we talked yesterday, the mother had moved and the worker did not know her whereabouts for some time, then she was reportedly in Shelby County, I called in attempt to transfer the case to find out she moved to Jefferson County with her mother, I did contact Jefferson County in attempts to transfer the case, I decided to keep the case in Pike County due to the father having custody of the children. LaToya Jones, Jefferson County DPP is providing courtesy services to Ms Mischler.

I have already sent you the case plan, finding letter and court order that ordered family services to be provided to the family.
If I have left any thing out please let me know.

Thanks


3-23-2007--Letter was sent to Ms. Mischler (see attached)


Recommendations (where appropriate):
- Re-create Case-This is currently being done.
- Assist her with applying for open records - Carrie Hall agreed to do this.

(Attachment D)

26/44

- Transfer case to Johnson Co. ASAP. Regional office has agreed to do this.
- Explore further if court order substantiating neglect on the children, has been appealed. The regional office is currently doing this
- Add the allegations against the NF into twist and assess for acceptance/services. The regional office is currently doing this.
- Correct the findings in referral #3, so that the NM is not on the central registry for neglect on two separate occasions, as this is not correct. Regional office has agreed to do this.

**Date completed and returned to Administrative Staff for Directors review and distribution:**
03-23-2007

(Attachment D)

DCBS Number: 205338
DCBS Name: Amy Mischler

INV-3

e   r

Worker Signature _____  Date: _____
                    *If Applicable*

Supervisor Signature _____  Date: _____
                    *If Applicable*

## HISTORY OF OVERRIDE INFORMATION:

| Primary Individual | Other Individual | Incident | Program/ SubProgram | Supervisor Results | Override Date | Override Reason |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | Amy Mischler | 1 | Neglect | Substantiated | | |
| ▓▓▓▓ | Amy Mischler | 1 | Neglect | Unsubstantiated | Jul 19, 2007 | Additional Information |
| ▓▓▓▓ | Amy Mischler | 1 | Neglect | Substantiated | | |
| ▓▓▓▓ | Amy Mischler | 1 | Neglect | Unsubstantiated | Jul 19, 2007 | Additional Information |

Referral Results Override Date:           7/19/2007

Referral Results Override Reason Notes Summary:
Jul 19 2007 11:39 AM - Gretchen Marshall
The findings were reversed following a CAPTA.   The final order (signed on 7/13/07) was received in Quality Assurance on 7/19/07.

Exhibit J

29/44

**Date:**  Mon 19 Mar 2007 01:44:08 AM EDT

**From:**  Trustworthy <noreply-comment@blogger.com>

[                    |                |                    ]

**To:**  <pikecountyinjustice@myway.com>

**Subject:**  [Pike County Injustice Files] New comment on The beginning of the Harvest..

has left a new comment on your post "

".

Unfortunately, I don't think a judge will take one's hair into account when deciding custody. I think things such as, oh, I dunno, child abuse will factor in more heavily. Nice try at a schoolyard insult, though. I'm sure Stevens is at home crying now as a result of your wit.

- Fess up - is this about the kids with you or is it about trying to embarrass your ex-husband?

I mean, it's a rhetorical question, because we all know the answer, but it'd still be interesting to hear your version.

this comment.

this comment.

comments for this blog.

Posted by Trustworthy to                                      at Monday, March 19, 2007
1:44:00 AM

**EXHIBIT 1**

Appellants' reply brief, if any, shall be filed on or before noon, Friday, September 14, 2018.

Appellant's motion for leave to increase the page limits of the briefs, is granted to the extent that the appellant's brief shall not exceed one hundred (100) pages, the appellee's brief shall not exceed one hundred (100) pages, the appellant's reply brief, if any, shall not exceed twenty-five (25) pages.

Pursuant to CR 76.16, oral argument in the above-styled action will be heard, on Thursday, September 20, 2018 at 10:00 a.m. in the Supreme Court courtroom.

Twenty minutes will be allotted each side for argument.

ENTERED: August 10, 2018.

_____
                              Chief Justice